UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| In re | : | |
| | : | Chapter 11 |
| **THE LENOX CONDOMINIUM LLC,** | : | Case No. 10-11391 (ALG) |
| | : | |
| Debtor. | : | |
| | : | |
| | x | |

# DISCLOSURE STATEMENT FOR
# PLAN OF REORGANIZATION
# OF THE LENOX CONDOMINIUM LLC

**Robert R. Leinwand**
**Robert M. Sasloff**
**ROBINSON BROG LEINWAND GREENE**
 **GENOVESE & GLUCK P.C.**
**Attorneys for the Debtor**
875 Third Avenue
New York, New York 10022
Tel No.: 212-603-6300

**Dated:** New York, New York
         November 24, 2010

**THIS IS NOT A SOLICITTION OF ACCEPTANCES OR REJECTIONS OF THE DEBTOR'S PROPOSED PLAN. ACCEPTANCES OR REJECTIONS OF THE PROPOSED PLAN MAY NOE BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

## SUMMARY

**The Lenox Condominium LLC** (the "Debtor"), has filed its *Plan of Reorganization of The Lenox Condominium LLC* dated November 24, 2010 (the "Plan"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). This *Disclosure Statement for Plan of Reorganization of The Lenox Condominium LLC* (the "Disclosure Statement") has received the approval of the Bankruptcy Court for use in connection with the solicitation of acceptances of the Plan from holders of Claims against and Interests in the Debtor pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code").

A copy of the Plan accompanies this Disclosure Statement. A glossary of terms frequently used in this Disclosure Statement is set forth in Article 1 of the Plan. Words used but not defined herein shall have the meaning ascribed to such terms in the glossary.

In the Debtor's opinion, the treatment of Claims and Interests under the Plan provides a greater recovery for Creditors and Interest Holders than that which would be likely to be achieved under other alternatives for the reorganization or liquidation of the Debtor.

**The Debtor believes that Confirmation of the Plan is in the best interests of Creditors and Interest Holders.**

## THE DEBTOR

The Debtor is in the real estate development business. The Debtor currently is the owner of 18 condominium units (the "Property") in a 77-unit, 12-story, full-service luxury condominium located on Lenox Avenue between 129th Street and 130th Street, in New York, New York (the "Premises"). The Debtor's sole member is **Uptown Partners** LLC, but its day-to-day affairs are managed by its **President, Lewis Futterman**. The Property is encumbered by a first priority mortgage in the approximate amount of **$10,300,000[1]** to **Capital One, N.A.**

## THE PLAN

The Plan provides for the payment by the Debtor of distributions to Creditors in accordance with the priorities established by the Bankruptcy Code. The creditor distributions shall be funded from the sale of the Debtor's Property, the 18 condominium units over a two (2)

---

[1] **Capital One, N.A.** filed a claim with the Bankruptcy Court on August 10, 2010 in the amount of **$10,402,842.31**.

{00507872.DOC 1 }507872

year period. The sales will be spearheaded by Halstead Property, one of the leading residential brokerage firms. Payments and distributions to be made under the Plan shall be distributed to the Creditors as set forth in Articles 4 and 5 from (a) the Proceeds of the sale of the Debtor's Property over a two (2) year period beginning on the Confirmation date; (b) cash assets of the Debtor existing as of the Effective Date; (c) cash generated from operations following the Effective Date; and (d) such other assets as may be identified by the Debtor. The Net Sale Proceeds, as defined in the Plan shall be used as follows: (a) 82% to Capital One on account of its Secured Claim; (b) 5% to fund the Unsecured Creditor Fund; (c) fund all other classified or unclassified Claims; and (d) to finally fund sales commissions, marketing costs and general operations.

        The table below provides a summary of the classification and treatment of Claims and Interests under the Plan. The figures set forth in the table below represent the Debtor's best estimate of the total amount of Allowed Claims and Allowed Interests in the Case. These estimates have been developed by the Debtor based on an analysis of the Schedules filed by the Debtor, the Proofs of Claims and Proofs of Interests filed by Creditors and Interest Holders, and certain other documents of public record. The Bankruptcy Court set September 22, 2010 as the final date for filing Proofs of Claims and Proofs of Interests by Creditors and Interest Holders. See "SIGNIFICANT EVENTS IN THE CASE -- Bar Date." Although the Debtor believes that the amounts of the claims set forth below are substantially correct, there can be no assurance that Claims and Interests will be allowed by the Bankruptcy Court in the amounts set forth below:

| Class and Estimated Amount[2] | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| As of October, 2010, Debtor's counsel has incurred $56,494.13 in fees and $186.09 in disbursements | Administrative Claims (including Claims for Professional Compensation and Reimbursement, Post-petition Ordinary Course Liabilities and Post-Petition Tax Claims. | **Unimpaired.** Each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in Cash in full on (i) the later of the Effective Date, the date payment of such Claim is due under the terms thereof or applicable law, or three business days after such Claim becomes an Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Disbursing Agent and the holder of such Claim; *provided, however,* that any Administrative Claim incurred by the Debtor in the ordinary course of its business shall be paid in full in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto. |

---

[2]    The amounts set forth in this schedule are not, and should not be deemed admissions by the Debtor as to the validity or amount of any claim and the Debtor reserves all rights to object to any claim in this case.

| Class and Estimated Amount[2] | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| Class 1 Unknown, but believed not to exceed $1,000 | Priority Claims (other than Administrative Claims) | **Unimpaired.** Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of Priority Claims, each holder of a Priority Claim shall receive on the Effective Date, Cash in the full amount of its Allowed Priority Claim. |
| Class 2 Scheduled in the amount of $10,323,000  Filed in the amount of $10,402,842.31 | Capital One Secured Claim | **Class 2 – Capital One Secured Claim.** Subject to the provisions of article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of the Capital One Secured Claim, Capital One shall be paid in full with interest (interest shall be calculated as the prime rate plus ½%) over a period of two (2) years from the proceeds of the Sale of Debtor's Property. Capital One shall receive 82% of the Net Sale Proceeds of the sale of each of the Debtor's 18 condominium units, credited first to interest, then to principal. Capital One shall retain its lien on the Property until its Secured Claim is paid in full. |
| Class 3 Scheduled in the aggregate amount of $193,200.00  Filed in the aggregate amount of $1,276,310.89[3]  The aggregate amount to be distributed to holders of Class 3 claims is not believed to exceed $200,000.00. | Unsecured Claims | **Class 3 – Unsecured Claims.** Subject to the provisions of article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of Class 3 Unsecured Claims, each holder of an Allowed Class 3 Unsecured Claim shall receive a pro rata share of the Unsecured Creditor Fund |
| Class 4 | Equity Interests | **Class 4 - Equity Interests.** In exchange for the guaranty by Uptown Partners, LLC, the sole member of the Debtor, of the distribution to the Unsecured Creditors, the holder of the Allowed Interests shall retain its Allowed Interest in the Debtor in such proportion as existed prior to the filing of this |

---

[3]     Amount as set forth on the claims register. This amount is inclusive of the **Board of Managers of The Lenox Condominium** (the "Condominium Board") Claim filed in the amount of **$1,222,897.00.** Debtor believes that this claim is statutorily barred, and will be filing a claims objection motion with respect thereto.

| Class and Estimated Amount[2] | Type of Claim or Equity Interest | Summary of Treatment |
|---|---|---|
| | | case on the Petition Date. |

## CONFIRMATION OF THE PLAN

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan, on _____ **at ___ a.m.,** Eastern Standard Time, in the **United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, NY, 10004**. Objections, if any, to Confirmation of the Plan shall be filed and served on or before _____**.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. The Debtor intends to seek Confirmation of the Plan at the Confirmation Hearing. **The Debtor believes that the Plan satisfies all applicable requirements of section 1129(a) and section 1129(b) of the Bankruptcy Code**. Confirmation makes the Plan binding upon the Debtor, its Interest Holders, all Creditors and other parties regardless of whether they have accepted the Plan.

As of the Effective Date, all holders of Claims or Interests will be precluded from asserting any Claim against the Debtor or its assets or other interests in the Debtor based on any transaction or other activity of any kind that occurred before the Confirmation Date except as otherwise provided in the Plan.

## VOTING INSTRUCTIONS — SUMMARY

The following discussion summarizes more detailed voting instructions set forth in the section of this Disclosure Statement entitled "VOTING INSTRUCTIONS." If you have any questions regarding the timing or manner of casting your ballot, please refer to the "VOTING INSTRUCTIONS" section of this Disclosure Statement and the instructions contained on the ballot that you received with this Disclosure Statement.

**General**. The Debtor has sent to all of its known Creditors who are in Classes impaired under the Plan a ballot with voting instructions and a copy of this Disclosure

Statement. Creditors may refer to the above chart to determine whether they are impaired and entitled to vote on the Plan. Creditors should read the ballot carefully and follow the voting instructions. Creditors should only use the official ballot that accompanies this Disclosure Statement.

The Plan can be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by (a) the holders of two-thirds in amount and more than one-half in number of claims in each class who actually vote on the Plan. In the event the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if (i) the Bankruptcy Court finds that the Plan accords fair and equitable treatment, and does not discriminate unfairly, with respect to the class rejecting it and (ii) at least one impaired class of creditors excluding insiders has accepted the Plan. See "REQUIREMENTS FOR CONFIRMATION" and "EFFECT OF CONFIRMATION."

**As the preceding paragraph makes evident, a successful reorganization depends upon the receipt of a sufficient number of votes in support of the Plan. YOUR VOTE IS THEREFORE EXTREMELY IMPORTANT. Creditors should exercise their right to vote to accept or reject the Plan.**

**Voting Multiple Claims and Interests**. A single form of ballot is provided for each Class of Claims. Any Person who holds Claims in more than one Class is required to vote separately with respect to each Class in which such Person holds Claims. However, any Person who holds more than one Claim in one particular Class will be deemed to hold only a single Claim in such Class in the aggregate amount of all Allowed Claims in such Class held by such Person. Thus each Person need complete only one ballot for each Class.

**Deadline for Returning Ballots**. The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan by Classes 2 and 3 must be received by the Debtor, no later than 5:00 p.m., Eastern Standard Time, on _____ at the following address:

**Robinson Brog Leinwand Greene Genovese & Gluck P.C.**
875 Third Avenue
9th Floor
New York, New York 10022
**Attn: Robert M. Sasloff, Esq.**

**Voting Questions**. If you have any questions regarding the provisions or requirements for voting to accept the Plan or require assistance in completing your ballot, you may contact Robert M. Sasloff, Esq. at (212) 603-6329.

NOTICE TO HOLDERS OF CLAIMS AND INTERESTS

This Disclosure Statement and the accompanying ballots are being furnished by the Debtor to the Debtor's known Creditors pursuant to section 1125(b) of the Bankruptcy Code in connection with a solicitation of acceptances of a plan of reorganization by the Debtor.  The Plan is filed with the Bankruptcy Court and is incorporated herein by reference. Parties in interest may view the Plan on the Internet at http://www.nysb.uscourts.gov.[4]

The purpose of this Disclosure Statement is to enable you, as a Creditor whose Claim is in a Class impaired under the Plan to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR.  THE STATEMENTS AND OPINIONS SET FORTH HEREIN ARE THOSE OF THE DEBTOR, AND NO OTHER PARTY HAS ANY RESPONSIBILITY WITH RESPECT THERETO.**

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN PROPOSED BY THE DEBTOR.  PLEASE READ THIS DOCUMENT WITH CARE.**

**THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY ANY BANKRUPTCY COURT, THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE FAIRNESS OR MERITS OF THE PLAN OR UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.**

---

[4]     A password is necessary for access to view documents on the Internet.

The historical information concerning the Debtor has been prepared using the Debtor's books and records and certain filings made with the Bankruptcy Court. The estimates of Claims set forth herein may vary from the final amounts of Claims allowed by the Bankruptcy Court. While every effort has been made to ensure the accuracy of all such information, except as noted in the Disclosure Statement, the information presented herein is unaudited and has not been examined, reviewed or compiled by any independent public accountants.

Notwithstanding any provision of the Plan to the contrary, definitions and descriptions contained herein respecting pre-Petition Date documents, agreements, or claims are provided solely for the purpose of identification and classification thereof and do not constitute an admission by the Debtor of the existence, validity, allowance, or amount of any such claim, document or agreement. The Debtor expressly reserves the right to challenge the existence, validity, allowance, or amount of any such claim, document or agreement.

The Projections, annexed hereto as **Exhibit A**, are a presentation of possible future events based on certain assumptions regarding the operations of the Debtor. The Projections were not prepared with a view toward public disclosure or compliance with the guidelines established by the Securities and Exchange Commission and were not prepared with a view towards compliance in all instances with the guidelines established by the American Institute of Certified Public Accountants regarding financial forecasts. The Projections have not been prepared in accordance with generally accepted accounting principles in all instances. Further, such projections have not been examined, reviewed or compiled by the Debtor's independent public accountants.

While presented with numerical specificity, the Projections are based upon a variety of assumptions which, although the Debtor believes are reasonable, may not be realized, and are subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Debtor. Consequently, the inclusion of the Projections herein should not be regarded as a representation by the Debtor (or any other person) that the Projections will be realized, and actual results may vary materially from those presented below. Due to the fact that such Projections are subject to significant uncertainty and are based upon assumptions which may not prove to be correct, neither the Debtor nor any other person assumes any responsibility for their accuracy or completeness.

This Disclosure Statement contains a summary of certain provisions of the Plan and the transactions contemplated thereunder, as well as descriptions of certain other related

documents.  While the Debtor believes that these summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents. Reference is made to the Plan and the documents referred to herein and therein for a complete statement of the terms and provisions thereof.  In the event of any inconsistency between the terms of the Plan and this Disclosure Statement, the terms of the Plan shall be controlling.  In reviewing the Plan and this Disclosure Statement, the reader should give special attention to "RISK FACTORS."  No statements or information concerning the Debtor, its assets or its future business operations, results of operations or financial condition, are authorized by the Debtor other than as set forth in this Disclosure Statement and the exhibits hereto (including the Plan).

   The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein.  The delivery of this Disclosure Statement shall not create, under any circumstances, an implication that there has been no change in the facts set forth herein since the date hereof.

   This Disclosure Statement is intended for the sole use of Creditors to make an informed decision about the Plan.  Each holder of a Claim should review this Disclosure Statement and all exhibits hereto (including the Plan) before casting a ballot.  Holders of Claims or Interests are urged to consult with their own legal and financial advisors.

   No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  No Person has been authorized to use or promulgate any information concerning the Debtor or its business or the Plan, other than the information contained in this Disclosure Statement and the exhibits hereto.  You should not rely on any information relating to the Debtor or its business or the Plan other than that contained in this Disclosure Statement and the exhibits hereto.

## RECOMMENDATION

   In the Debtor's opinion, the treatment of Creditors under the Plan provides a greater recovery than is likely to be achieved under any other alternatives, including liquidation under Chapter 7.  See "ALTERNATIVES TO THE PLAN."  The Plan as proposed provides for a restructuring of the Debtor's obligations and a full payment to holders of Allowed Claims over time. In Chapter 7 liquidation, the Debtor believes that (1) administrative costs will be greater; and (2) that the value of any distribution will be discounted by the litigation and delays which will precede any such distribution.  In particular, in Chapter 7 liquidation, in addition to increased administrative costs, there would be a substantial risk that the Debtor's Property will not be sold for more than the obligations due

on the Secured Claim of Capital One.  This factor would significantly impact any distribution to the Unsecured Creditors, thereby making it unlikely that Unsecured Creditors would receive any distribution greater than as is provided for under the Plan.

**THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND URGES EACH CREDITOR ENTITLED TO VOTE TO ACCEPT THE PLAN.**

### THE DEBTOR

In or about 2001, Uptown Partners, LLC, now the 100% owner of the Debtor, commenced negotiations with Pentecostal Faith Church (the "Church"), the then owners of the block-front on Lenox Avenue between 129th and 130th Streets, in New York, New York, for the purchase of said Premises.  At that time, the Premises contained a large never completed structure, which had originally been intended to be a new home for the Church. The Premises sat derelict for more than fifteen (15) years, and was considered a neighborhood eyesore.  In or about 2004, after securing financing and all necessary New York City permits, the Debtor purchased the Premises from the Church.

The Debtor commenced construction on a 77-unit, 12-story, full-service luxury condominium.  It was the first large condominium project developed in Harlem with no governmental subsidies.  Sales began during the later phases of the excavation/foundation period in or about Fall of 2005, with a special outreach to the upscale African American Community with prior roots in the community.

From the onset, the sales response to the development was extremely positive. In or about January of 2007, when the first tenants began to move in, approximately one-half of the units of the building were sold.  By mid-2007, the development was approximately 60% sold, almost all to owner occupants.  The development was considered to be the most successful condominium development in what was then a booming Harlem.  In late July of 2007, a $19,600,000 loan (the "Mortgage") was obtained from North Fork Bank for the primary purpose of buying out the minority shareholders of the Debtor, for approximately $13,000,000, and to pay off the remaining balance of the original development loans, including the balance of a $32,000,000 construction loan from Citibank.  A significant interest reserve was provided in the Mortgage to cover two (2) years' interest based upon the expected sell-through during the initial term of the Mortgage.

It was the Debtor's clear intention to sell sufficient units to pay down the

Mortgage by approximately 40 – 50%, and rent the balance of the development for two – three years, and thereafter, sell the rental units. Such procedure was to benefit from the expected increase in values in Harlem, and gaining capital gains treatment of the ensuing profit from said sales. Shortly thereafter, Capital One took over North Fork Bank. During the 18-months following the closing of the Mortgage, the Debtor had sold enough units to pay the Mortgage down by over 40%, or to about $10,800,000, against what was then $20,000,000 of remaining book value. However, from mid-2008, the sales of the Property like the rest of the real estate industry, virtually ceased. With a real estate slowdown, the Debtor approached Capital One in the Fall of 2008 about a loan extension, and continued to lease out as many of the remaining units as possible. In or about November of 2008, Capital One ceased returning the Debtor's phone calls about a loan extension or renewal.

After the receipt of a Default Letter in or about January of 2009 from Capital One based upon technicalities regarding insurance and the Debtor's purported "renting without permission", and Capital One's ceasing paying itself interest from the still ample reserve fund, and demanding that the Debtor commence payments from its own funds, the Debtor, rather than fighting with Capital One, decided to work with the Bank, and signed an initial forbearance agreement which required the Debtor to meet certain very aggressive pay-off goals, and then signed another Forbearance Agreement with similar requirements. The forbearance agreement was to expire on November 30, 2009. Under both forbearance agreements, Debtor had to tender the deeds to the Property to be held as additional security.

Sales in Manhattan, and especially in Harlem, were very slow during late 2008 and all of 2009. According to available reports, approximately 60 out of 850 available Harlem condominium units were sold in 2009. Having sold only one unit at Capital One's insistence (Penthouse A at a substantial discount), it became clear by September, 2009 that the Debtor was not going to timely approach the pay-off requirements.

Since the Debtor was anxious to find a pay-off or pay-down program which would satisfy Capital One, at Capital One's suggestion, the Debtor began to seek partners or private lenders who might assist. Accordingly, in or about late September of 2009, the Debtor began to focus on ways it might pay down the obligation to Capital One without diminishing its collateral value, thus decreasing its loan-to-value. The Debtor was seeking to obtain sufficient funds to pay the Mortgage's interest one year in advance. However, the Debtor faced two (2) significant problems. Firstly, despite substantial lender/investor interest, there were a historically high number of real estate investment opportunities competing for the available funds. Secondly, Capital One, despite encouraging this outreach, was willing to provide the Debtor with any guidelines as to what sort of deal would be acceptable.

Nevertheless, the Debtor aggressively reached out to dozens of potential funding sources. In late October, 2009, the Debtor approached Capital One with an offer from some local secondary lenders whereby they would purchase the back $2,000,000.00 of the Mortgage and provide the Debtor with sufficient additional capital to pre-pay one year's estimated Bank interest and aggressively promote sales. The collateral for the advance would have been a second mortgage subordinate to Capital One's position. This offer was summarily rejected by Capital One.

Faced with the rejection of that proposal, the Debtor sought others, and received a promising offer from an off-shore investment group to pay down the mortgage by $3,600,000, and instead of requesting a second mortgage position, this group would accept control of the Debtor, until such time as the lenders were paid off. This would have reduced Capital One's loan-to-value to approximately 33%, and safeguard all of its protections, including the Deeds in Lieu. Moreover, Capital One would also receive a one-year pre-payment of interest. After six or seven weeks of the Debtor pleading with them to communicate effectively on this proposal (an average of 10 calls or emails for each return response, Capital One finally agreed in mid-December, to accept the offer. The Debtor spent in excess of $90,000 to finalize the transaction; however, one week before the expected January closing date, the Debtor was advised by the Bank, that it had decided not to go through with the deal. Additionally, within one hour of the Bank's stating its position, the Debtor was handed new Default Notices.

The Debtor continued to try to appease the Bank, and within three (3) weeks was able to present the Bank with a firm offer from a reputable Canadian Group for a prompt buy-out at $9,100,000 of the Mortgage. Capital One never responded to this offer, despite various requests for it to either accept or reject the offer. Moreover, despite several attempts by the Debtor to ascertain what parameters existed for an acceptable deal, Capital One refused to provide said information.

Capital One did grant the Debtor two (2) further one-month extensions of the forbearance period, provided that the Debtor pay the current interest. During the interim, the Debtor, when able to communicate with a Capital One representative, discussed the various proposals with Capital One; however, no arrangements were ever reached to the satisfaction of the Debtor and Capital One, and prior to the expiration of the final forbearance agreement, the Debtor sought protections pursuant to Chapter 11 of the Bankruptcy Code.

# SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE

**RETENTION OF PROFESSIONALS**

Section 327(a) of the Bankruptcy Code provides that the Debtor, with the court's approval, may employ one or more accountants or other professional persons that do not hold or represent an interest adverse to the estate and that are disinterested persons to represent or assist the Debtor in carrying out its duties under the Bankruptcy Code. 11 U.S.C. §327(a).

By Order of this Court entered on **April 30,** 2010, the Debtor retained the firm of **Robinson Brog Leinwand Greene Genovese & Gluck P.C.** as its bankruptcy counsel.
**BAR DATE**

In accordance with the requirements of section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, the Debtor filed its Schedules of its assets and liabilities, including schedules of all of its known creditors and the amounts and priorities of the Claims the Debtor believes are owed to such creditors. Pursuant to section 501 of the Bankruptcy Code any creditor or interest holder may file a Proof of Claim or Interest and, unless disputed, such filed Proof of Claim or Interest supersedes the amount and priority set forth in the Debtor's schedules. The Bankruptcy Court set **September 22, 2010** as the last date for filing Proofs of Claim and Proofs of Interest with the Bankruptcy Court by Creditors and Interest Holders ("Bar Date").

## OPERATING REPORTS

Pursuant to the requirements of the Office of the United States Trustee for the Southern District of New York, the Debtor has regularly prepared and filed monthly operating reports with the Bankruptcy Court detailing the results of the Debtor's ongoing business operations. Copies of such reports may be obtained from the Bankruptcy Court during normal business hours, or may be obtained upon written request made to counsel for the Debtor.

## CASH COLLATERAL

After the filing of the case, Debtor, through its counsel, opened a dialogue with **Capital One** by its counsel, in order to see if a cash collateral agreement could be reached by and between the parties. On or about May 21, 2010, the parties were able to agree to the terms of a Stipulation and Order for use of cash collateral (the "Stipulation"), which, by motion, was presented to this Court for approval. On May 27, 2010, this Court "So Ordered" the Stipulation. Unfortunately, the Stipulation expired, and the parties were unable to get it extended until, as per the direction of

this Court, the parties entered into a second Stipulation (the "Second Stipulation"). The Second Stipulation covers the period **August 2010 through December 2010**, and was approved by this Court on **November 3, 2010**.

## CAPITAL ONE'S DISMISSAL MOTION

During the case, Debtor has tried to negotiate with various different parties arrangements that could have enabled it to either dismiss this case or propose a consensual plan of reorganization. Unfortunately, none of these negotiations concluded in a deal that Capital One was prepared to accept. After the Court directed the filing of certain delinquent operating reports by a date certain and because Capital One did not have any confidence in the Debtor, they filed a motion to dismiss and/or convert with this Court on August 31, 2010[5] (the "Dismissal Motion"). The main premise of the Dismissal Motion was that Debtor's case had been filed in bad faith.

Debtor filed opposition papers (the "Opposition") to the Dismissal Motion. The Opposition provided that the case was filed in the utmost of good faith, to preserve the Debtor's most significant asset, the Property, and that the Debtor had every intention to reorganize. The Debtor submitted to the Court that had it not filed, Capital One would have released from escrow the deeds in lieu it held to secure its debt, and that the substantial equity that the Debtor had in the Property would have been lost to the detriment of its estate. Debtor, working with Halstead Property Development Marketing, LLC, believes that if a reasonable marketing and sale plan was initiated by the Debtor, sales resulting in a net income to it of between $14,500,000.00 to $16,000,000.00 could be achieved over in two (2) year span.

Finally, the Opposition detailed how from February 2010 until September 2010, due to a hold put on sales by the New York State Attorney General's Office (the "NYSAG"), the Debtor could not accept purchase offers for its Property. However, in September 2010, Debtor received a letter from the NYSAG accepting a recent amendment to its Offering Plan, which allows the Debtor to immediately commence a sales program. A copy of the approval is annexed as **Exhibit B**. Sales efforts commenced a few weeks thereafter, under the direction of Halstead Realty.

This Court, having heard oral argument on September 24, 2010 of the Dismissal Motion and the Opposition, was prepared to rule on the matter, but based upon Debtor's representation that it could file a confirmable plan of reorganization in a reasonable time, adjourned the Dismissal Motion to December 7, 2010, and directed that the Debtor file its plan by

---

[5] Debtor's reports had been prepared and were filed the following day. Debtor submits that Capital One would have filed the Dismissal Motion regardless of whether the reports would have been filed a day earlier.

**November 24, 2010**.

## SUMMARY OF THE PLAN

The following summary of the terms of the Plan is qualified in its entirety by reference to the provisions of the Plan, a copy of which accompanies this Disclosure Statement and which is incorporated herein by reference.

### Classification of Claims and Interests

Classification of claims is governed, in part, by sections 1122 and 1123(a) of the Bankruptcy Code. Section 1123(a) requires that a plan designate classes of claims, requires that the plan specify the treatment of any impaired class of claims, and requires that the plan provide the same treatment for each claim of a particular class, unless the holder of a claim receiving less favorable treatment consents to such treatment. 11 U.S.C.§1123(a)(1), (3) and (4). Section 1122(a) of the Bankruptcy Code provides, subject to an exception for administrative convenience, that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

As set forth in Article 2 of the Plan, pursuant to section 1123(a) (1) of the Bankruptcy Code, certain Administrative Claims against the Debtor have not been classified. See "SUMMARY OF THE PLAN -- Treatment of Non-Classified Claims."

Article 3 of the Plan classifies the various Claims against and Interests in the Debtor into three (3) classes of Claims and one (1) class of Interests:

| | |
|---|---|
| Class 1 - | Priority Claims |
| Class 2 - | Capital One Secured Claim |
| Class 3 - | Unsecured Claims |
| Class 4 - | Equity Interests |

Claims in Class 1 and Interests in Class 4 are unimpaired under the Plan. The votes of Holders of Claims and Interests in such Classes are therefore NOT being solicited, are NOT entitled to vote to accept or reject the Plan and are deemed to have accepted the Plan.

Claims in Classes 2 and 3 are impaired under the Plan. Holders of Claims in Classes 2 and 3 are being solicited and are entitled to vote to accept or reject the Plan.

**Class 1 - Priority Claims.** Class 1 consists of all Allowed Claims, other than Administrative Claims or Bankruptcy Fees, to the extent entitled to priority under section 507 of the Bankruptcy Code. Claims that may be classified in Class 1 may include, for example, certain claims of employees of the Debtor for wages, salaries and commissions or contributions to employee benefit plans up to an aggregate amount of $11,725 per employee. Certain Claims for taxes and the payment of expenses incurred by the Debtor subsequent to the Petition Date are entitled to priority under section 507 of the Bankruptcy Code, and are treated elsewhere as non-classified Claims. See "SUMMARY OF THE PLAN -- Treatment of Non-Classified Claims." The Debtor does not believe that there are any claims in this class.

**Class 2 – Capital One Secured Claim.** Class 2 consists of the Capital One Secured Claim. The Debtor scheduled Capital One with a claim of $10,323,000, while Capital One filed a claim for $10,402,842.31 plus interest.

**Class 3 - Unsecured Claims.** Class 3 consists of all Unsecured Claims. Debtor scheduled Unsecured Claims of approximately $193,000.00, but claims were filed in excess of $1,276,000.00. One particular claim, which the Debtor believes is time-barred, was filed by the Condominium Board for $1,222,897.68. Debtor will be filing a claim objection motion shortly with respect to expunging said claim, and believes that by the Confirmation Date, an Order will be entered with respect thereto.

**Class 4 – Equity Interests.** Class 4 consists of the Equity Interests in the Debtor.

**TREATMENT OF CLAIMS AND INTERESTS CLASSIFIED UNDER THE PLAN**

Articles 4 and 5 of the Plan provide for the treatment of impaired and unimpaired Claims classified in Article 3 of the Plan as follows:

Allowed Claims in Class 1 and Allowed Interests in Class 4 are not impaired. Allowed Claims in Classes 2 and 3 are impaired. Each class of Claims and Interests shall receive the following treatment under the Plan:

**Class 1 - Priority Claims.**

Subject to the provisions of Article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of Priority Claims, each holder of a Priority Claim shall receive on the Effective Date, Cash in the full amount of its Allowed Priority Claim plus Post-Petition Interest.

**Class 2 – Capital One Secured Claim.**  Subject to the provisions of article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of the Capital One Secured Claim, Capital One shall be paid in full with interest (interest shall be calculated as the prime rate plus ½%) over a period of two (2) years from the proceeds of the Sale of Debtor's Property.  Capital One shall receive 82% of the Net Sale Proceeds of the sale of each of the Debtor's 18 condominium units, credited first to interest, then to principal.  Capital One shall retain its lien on the Property until its Secured Claim is paid in full.

**Class 3 – Unsecured Claims.**  Subject to the provisions of article 8 of the Plan with respect to Disputed Claims, in full satisfaction, release and discharge of Class 3 Unsecured Claims, each holder of an Allowed Class 3 Unsecured Claim shall receive a pro rata share of the Unsecured Creditor Fund.

**Class 4 – Equity Interests.**  In exchange for the guaranty by Uptown Partners, LLC, the sole member of the Debtor, of the distribution to the Unsecured Creditors, the holder of the Allowed Interests shall retain its Allowed Interest in the Debtor in such proportion as existed prior to the filing of this case on the Petition Date.

## TREATMENT OF NON-CLASSIFIED CLAIMS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims entitled to priority treatment under section 507(a)(2) of the Bankruptcy Code or Claims of Governmental Units entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.  Article 2 of the Plan provides for the manner of treatment of such non-classified Claims.

**Administrative Claims.**  Administrative Claims are the costs and expenses of administration of this Case, allowable under section 503(b) of the Bankruptcy Code, other than Bankruptcy Fees.  Administrative Claims include Claims for the provision of goods and service to the Debtor after the Petition Date, the liabilities incurred in the ordinary course of the Debtor's business (other than claims of governmental units for taxes or interest or penalties related to such taxes) after the Petition Date, Claims of professionals, such as attorneys, appraisers, and accountants, retained pursuant to an order of the Bankruptcy Court, for compensation and

reimbursement of expenses under section 330 of the Bankruptcy Code, and tax claims for the period from the Petition Date to the Effective Date of the Plan.

Each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in Cash in full on (i) the later of the Effective Date, the date payment of such Claim is due under the terms thereof or applicable law, or three business days after such Claim becomes an Administrative Claim or (ii) as may be otherwise mutually agreed in writing between the Disbursing Agent and the holder of such Claim; *provided, however,* that any Administrative Claim incurred by the Debtor in the ordinary course of its business shall be paid in full in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim and any agreements relating thereto.

Article 2 of the Plan sets a final date for the filing of Administrative Claims against the Debtor. The Administrative Bar Date is the earlier of the first Business Day that is at least 60 days after the Effective Date or a date fixed by order of this Court.

Section 330 of the Bankruptcy Code sets the standard for the determination by the Bankruptcy Court of the appropriateness of fees to be awarded to Professionals retained by the Debtor in a case under the Bankruptcy Code. In general, bankruptcy legal services are entitled to command the same competency of counsel as other cases. "In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable service other than in a case under title 11." 124 Cong. Rec. H11091 (Daily ed. Sept. 28, 1978).

To the extent any Administrative Claim had not been paid by the Debtor in the ordinary course of the Debtor's business, Debtor will pay same from cash on hand, rental income from the operation of its business, or the sale proceeds from the sale of the Debtor's Property. Debtor does not believe there are any unpaid Administrative Claims.

**Bankruptcy Fees.** All fees and charges assessed against the Debtor under section 1930 of title 28 of the United States Code and section 3717 of title 31 of the United States Code shall be paid by the Disbursing Agent in Cash in full as required by statute.

**Professional Fees.** Reasonable compensation due to the Debtors' professionals pursuant to section 330 of the Bankruptcy Code, as determined by the Bankruptcy Court, shall be payable in full and in Cash on the Effective Date unless otherwise agreed to in writing between the holder of such claim and the Debtor and approved by the Bankruptcy Court. Unless otherwise agreed to in writing by the Debtor and the applicable professional, each professional must serve

the Debtor with a writing indicating the sum of fees and expenses they intend to apply to the Court for reimbursement of and/or an award of, no later than three days prior to the Effective Date. Upon receipt of such notice, the Debtor must escrow sufficient funds, to be held in an interest bearing segregated account, in the amounts necessary to pay such claims when and if allowed by the Court. Debtor estimates that its bankruptcy counsel is due approximately **$57,000.00**.

**Priority Tax Claims.** Except as may be otherwise mutually agreed in writing, all Allowed Claims of Governmental Units entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code, shall be paid in full and receive on account of such claim, Cash in the amount of such Allowed Claim on the Effective Date. Debtor does not believe there are any Priority Tax Claims in existence.

## DISPUTED CLAIMS AND INTERESTS

Article 8 of the Plan contains a mechanism for resolving disputes concerning the amount of certain Claims or Interests asserted against the Debtor by any Entity.

**Time to Object.** Unless otherwise ordered by the Bankruptcy Court, objections to the allowance of any Claim or Interest may be filed no later than the later to occur of (i) 90 days after the Effective Date or (ii) 90 days after the date proof of such Claim or Interest is filed. Until the earlier of (i) the filing of an objection to a Proof of Claim or Interest or (ii) the last date to file objections to Claims or Interests as established by the Plan or by Final Order, Claims or Interests shall be deemed to be Disputed in their entirety if, (i) the amount specified in a Proof of Claim or Interest exceeds the amount of any corresponding Claim or Interest listed in the Schedules; (ii) any corresponding Claim or Interest listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (iii) no corresponding Claim or Interest has been listed in the Schedules.

## DISTRIBUTIONS UNDER THE PLAN

Article 8 contains provisions governing the making of distributions on account of Claims and Interests.  In general, any payments, distributions or other performance to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest shall be deemed to be timely made if made on or within five days following the later of (i) the Effective Date or (ii) the expiration of any applicable objection deadline with respect to such Claim or Interest or (iii) such other times provided in the Plan. All Cash payments to be made by the Debtor pursuant to the Plan shall be made by check drawn on a domestic bank.

**Disbursing Agent.**  The Debtor shall be the Disbursing Agent to make distributions under the Plan. The Disbursing Agent shall serve without compensation for services rendered under the Plan.  The Disbursing Agent shall serve with a bond or shall be bonded.

Distributions shall be made: (1) at the addresses set forth on the Proofs of Claim or Proofs of Interests filed by such holders; (2) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim or Proof of Interest; or (3) at the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Disbursing Agent has not received a written notice of a change of address.  If the distribution to the holder of any Claim or Interest is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then current address.  The Debtor shall not be required to attempt to locate any holder of an Allowed Claim or an Allowed Interest.

## UNCLAIMED DISTRIBUTIONS

Any Cash or other property to be distributed under the Plan shall revert to the Debtor if it is not claimed by the Entity entitled thereto before the later of (i) 180 days after the Effective Date or (ii) 60 days after an Order allowing the Claim of that Entity becomes a Final Order or are otherwise allowed.

## DISTRIBUTIONS WITH RESPECT TO DISPUTED CLAIMS

During the pendency of any objection to any Claim or Interest, no distribution under the Plan will be made to the holder of such Claim or Interest.  However, the Disbursing Agent shall segregate Cash equal to 100% of the initial amount which would be distributed on account of such Disputed Claim if such Claim had been an Allowed Claim but for the pendency

of the objection.  The Debtor may seek an order of the Bankruptcy Court estimating or limiting the amount of Cash or property that must be deposited in respect of any such disputed Claims or Interests.  Cash held in reserve for disputed Claims will be held in trust for the benefit of the holders of such Claims.

Until the dispute over the claim is resolved, the Disbursing Agent shall also segregate any interest or dividends earned upon such amount it is holding on account of such Disputed Claim.

Deposits in escrow on account of any Disputed Unsecured Claims shall be made annually thereafter, at least ten days prior to the anniversary of the Effective Date until all pending disputes are resolved. The Disbursing Agent shall also hold any interest or dividends earned on such funds until the dispute over such claim is resolved.

Within 30 days after the entry of a Final Order resolving an objection to a Disputed Claim, the Disbursing Agent shall distribute all Cash or other property held in escrow with respect to such claim, including any interest, dividends or proceeds thereof, to which a holder is then entitled with respect to any formerly Disputed Claim that has become an Allowed Claim. Any segregated amounts remaining after all Disputed Claims and Interests have been resolved will be retained by the Debtor.

## SURRENDER OF INSTRUMENTS

Notwithstanding the foregoing, no Creditor or Interest Holder that holds a note or other instrument of the Debtor evidencing such Creditor's Claim or Interest may receive any distribution with respect to such Claim or Interest unless and until the note or other instrument evidencing such Claim or Interest is surrendered pursuant to the provisions of section 8.12 of the Plan.  That section also contains specific provisions governing lost, stolen, or mutilated notes and instruments, including the requirement that reasonable indemnification be provided to the Disbursing Agent for such exchange.

## COMPLIANCE WITH TAX REQUIREMENTS

In connection with the Plan, the Disbursing Agent shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and distributions under the Plan shall be subject to such withholding and reporting requirements.

## EFFECTIVE DATE

The Effective Date of the Plan is defined as the 45th day after the Confirmation Date.

## CONDITIONS TO THE EFFECTIVE DATE

That a confirmation order shall be entered by this Court.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Effective on and as of the Effective Date, any and all of Executory Contracts and Unexpired Leases to which the Debtor is a party which (i) have not expired or terminated pursuant to their own terms, or (ii) have not previously been assumed, or assumed and assigned or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, or (iii) are not the subject of pending motions to assume or reject as of the Confirmation Date or (iv) are not specified in the list of Executory Contracts and Unexpired Leases to be rejected pursuant to the plan, are hereby specifically assumed.

**Rejection Claims**. Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtor pursuant to the Plan (as opposed to a separate order of the Bankruptcy Court) shall, pursuant to Section 502(g) of the Bankruptcy Code, be a treated as Unsecured Claims. A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be filed no later than the tenth (10th) day after the Confirmation Date. The Reorganized Debtor shall have thirty (30) days after the Confirmation Date to object to any such rejection Claims filed in accordance with Section 6.2 of the Plan.

**Cure**. Except as otherwise agreed to by the parties, on the Effective Date, the Reorganized Debtor shall cure any and all undisputed defaults under any Executory Contract or Unexpired Lease that is assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code. Unless the parties to the contract or lease agree otherwise, all disputed

defaults that are required to be cured shall be cured by the later to occur of (i) ten (10) days after the entry of a Final Order determining the amount, if any, of the Reorganized Debtor's liability with respect thereto and (ii) the Effective Date.

## THE REORGANIZED DEBTOR

The Debtor as the Reorganized Debtor shall continue to exist after the Effective Date, and Uptown Partners LLC shall be the 100% sole member of the Debtor. The Debtor's day-to-day affairs will continue to be managed by its President, **Lewis Futterman.**

## VESTING OF ASSETS

As of the Closing Date, any and all Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date. Any other asset of the Debtor shall vest in the Debtor free and clear of all Liens, Claims and encumbrances.

Following the Effective Date through the closing of the Debtor's chapter 11 case, the Debtor may settle and compromise any claims, interests and causes of action in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

## FUNDING OF PLAN

Payments and distributions to be made under the Plan shall be distributed to the Creditors as set forth in Articles 4 and 5 from (a) the Proceeds of the sale of the Debtor's Property over a two (2) year period beginning on the Confirmation date; (b) cash assets of the Debtor existing as of the Effective Date; (c) cash generated from operations following the Effective Date; and (d) such other assets as may be identified by the Debtor. The Net Sale Proceeds, as defined in the Plan shall be used as follows: (a) 82% to Capital One on account of its Secured Claim; (b) 5% to fund the Unsecured Creditor Fund; (c) fund all other classified or unclassified Claims; and (d) to finally fund sales commissions, marketing costs and general operations.

## PRESERVATION OF RIGHTS OF ACTION

The Debtor shall retain, and on the Effective Date shall be deemed to have assigned to the Reorganized Debtor, and the Reorganized Debtor may enforce any claims, rights and causes of action (i) arising under sections 544 through 550 of the Bankruptcy Code or (ii) belonging to the Debtor as of the Petition Date, or the Estate, and arising under any provision of state or federal law, or any theory of statutory or common law or equity.

## TRANSFER TAXES

Pursuant to section 1146(a) of the Bankruptcy Code, the initial issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer in connection with or in furtherance of the Plan shall be exempt and shall not be subject to tax under any law imposing a Transfer Tax, mortgage recording tax or similar tax as set forth in the Plan.

## REVOCATION OF THE PLAN

The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Debtor revokes or withdraws the Plan, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall constitute a waiver or release of any Claims by or against, or any Interest in, the Debtor; or prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor.

## RETENTION OF JURISDICTION

The Plan contains detailed provisions providing for the retention of jurisdiction by the Bankruptcy Court over the Case for the purposes of, *inter alia,* determining all disputes relating to Claims or Interests and other issues presented by or arising under the interpretation, implementation or enforcement of the Plan, and to determine all other matters pending on the date of confirmation.

# RISK FACTORS

## RISK FACTORS

Although the Debtor believes that it will be able to meet all of the obligations that it is undertaking pursuant to the Plan there can be no assurance that future events will not cause the Debtor to default on one or more of its obligations under the Plan. Each Creditor, Interest Holder and their respective advisers should consider the following factors (and other risks considered elsewhere in this Disclosure Statement).

## PROJECTIONS AND ASSUMPTIONS

The Disclosure Statement contains certain projections, estimates and assumptions (the "Projections") with respect to the amount of monies which will be necessary and available for distribution to Creditors under the terms of the Plan and with respect to the nature and amount of claims that may be allowed against the Debtor. There can be no assurance, however, that such assumptions are accurate. The Projections are based on assumptions that the Debtor believes are reasonable. They have not been reviewed for accuracy or reasonableness by the Debtor's counsel. Projections are, by nature, based on future events which cannot be predicted with accuracy and there is no assurance that the necessary funds can or will be obtained. Each Creditor must carefully read and consider the assumptions which are part of the Projections in determining whether to vote for the Plan. The Projections are annexed hereto as **Exhibit A**.

## RISK OF SUBSEQUENT REORGANIZATION OR LIQUIDATION

Although the Debtor believes that the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, there can be no assurance that such liquidation will not occur or that the need for such financial reorganization will not arise.

## CONFIRMATION OF THE PLAN

All distributions to Creditors are contingent on the Plan being confirmed by this Court. Otherwise, the Debtor is not obligated, in any way, to make the payments required hereunder.

## OPERATIONAL/FUNDING RISKS

Since the Plan as proposed provides for all payments to be made to creditors (or for reserves to be established) after the Effective Date from the sale proceeds of the sale of its

Property over a two (2) year span.  Attached hereto as **Exhibit C** is a letter from Halstead which provides its expert opinion that sales over that period will maximize the return to the estate.  The September 7, 2010 letter includes in part a Statement that they "are still enthusiastic about the properties for a successful sales outcome at Lenox.  It is still one of the best full-service luxury condominiums in Harlem.  Additionally, the Harlem market has continued to improve, and much of the prime product which came on the market during 2008/2009 has already been sold.  Hence, we feel the 18 units at Lenox are highly competitive with what remains available in Harlem at price reductions no worse than we originally projected.  After said discounts with sales and marketing costs, this will result in a net income to the Developer (the Debtor herein) if between $15,500,000 to $16,000,000 over a period of two (2) years."  Annexed as **Exhibit D** are lists of Harlem sales comparables for 2 and 3-bedroom apartments showing per square foot prices, which pricing compare favorably with the Debtor's projected sale prices, and thus confirm the Debtor's sales program.

A key element to the successful and timely implementation of the proposed sales program that funds the Plan is the effort on the Debtor's behalf being made by Halstead, the leading residential broker in Harlem.  Beginning in mid-September, a team put together by Halstead began putting together a sales program geared toward maximizing the profit potential of the Debtor's Property within a selling schedule not to exceed two (2) years.  Halstead has worked closely with the Debtor to increase customer awareness of the availability of the units and present them to potential buyers.  Halstead's efforts as of this month included adding the Lenox Condominium to its website, updating and improving the Lenox website, adjustment of prices to meet current market conditions, preparing model apartments, preparing a virtual model of each of the available units and holding open houses to increase visibility.

There exists risk though, in that in order for distributions to be made, the Debtor and Halstead need to sell the Debtor's Property in the time frame proposed.

## VOTING INSTRUCTIONS

As noted herein, Claims in Class 1 and Interests in Class 4 are not impaired by the Plan. Accordingly, holders of claims in Class 1 and Interests in Class 4 are deemed to have accepted the Plan and votes of holders of Claims and Interest in each class will not be solicited.

## VOTING INSTRUCTIONS

A Creditor who is entitled to vote may  accept or reject the Plan by executing and returning to the Balloting Agent (as defined below) the ballot (a "Ballot") that was sent out with

this Disclosure Statement. See "VOTING INSTRUCTIONS -- Who May Vote." The following instructions govern the time and manner for filing Ballots accepting or rejecting the Plan, withdrawing or revoking a previously filed acceptance or rejection, who may file a Ballot, and procedures for determining the validity or invalidity of any Ballot received by the Balloting Agent.

## DEADLINE FOR RECEIPT OF BALLOTS

The solicitation period for votes accepting or rejecting the Plan will expire at 5:00 p.m., Eastern Standard Time, _____ (the "Voting Deadline"). A Ballot accepting or rejecting the Plan must be received no later than that date and time or it will not be counted in connection with the Confirmation of the Plan or any modification thereof.

## BALLOTING AGENT

All votes to accept or reject the Plan must be cast by using the Ballot. Executed Ballots should be returned by _____ at 5:00 p.m. to:

> **Robinson Brog Leinwand Greene Genovese & Gluck P.C.**
> 875 Third Avenue, 9th Floor
> New York, New York 10022
> **Attn: Robert M. Sasloff, Esq.**

(the "Balloting Agent"). A Creditor entitled to vote who has not received a Ballot, or whose Ballot has been lost, stolen or destroyed, may contact the Balloting Agent at the address indicated above, or call Robert M. Sasloff at (212) 603-6329 to receive a replacement Ballot.

## WHO MAY VOTE - IN GENERAL

Claims in Classes 2 and 3 are impaired under the Plan. Holders of Claims in Classes 2 and 3 are being solicited and are entitled to vote to accept or reject the Plan. Claims in Class 1 and Interests in Class 4 are not impaired by the Plan and are deemed to have accepted the Plan.

**Ballots Executed in a Representative or Fiduciary Capacity**. Ballots executed by Debtor, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity, must indicate the capacity in which such

person executed the Ballot and, unless otherwise determined by the Debtor, must submit proper evidence satisfactory to the Debtor of their authority to so act.

**Voting Multiple Claims**. A single form of ballot is provided for each Class of Claims. Any Person who holds Claims in more than one Class is required to vote separately with respect to each Class in which such Person holds Claims. However, any Person who holds more than one Claim in one particular Class will be deemed to hold only a single Claim in such Class in the aggregate amount of all Allowed Claims in such Class held by such Person. Thus each Person need complete only one ballot for each Class.

## DEFECTS OR IRREGULARITIES

**IN THE EVENT AN EXECUTED AND TIMELY FILED BALLOT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, THE BALLOTING AGENT SHALL NOTIFY THE CREDITOR OR INTEREST HOLDER WHICH HAS EXECUTED THE BALLOT SO THAT ALL BALLOTS CASE REFLECT EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN.**

Where more than one timely and properly completed Ballot is received, the Ballot which bears the latest date will be counted.

The Debtor reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the deadline for filing timely Ballots. Except as set forth above, neither the Debtor, the Balloting Agent, nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liability for failure to provide such notification. All questions as to the validity, form, eligibility (including the time of receipt), acceptance and revocation or withdrawal of Ballots will be determined by the Bankruptcy Court, upon motion and upon such notice and hearing as is appropriate under the circumstances. Unless otherwise directed by the Bankruptcy Court, delivery of Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots as to which any irregularities have not been cured or waived will not be counted toward the acceptance or rejection of the Plan.

## REVOCATION OF PREVIOUSLY FILED ACCEPTANCES OR REJECTIONS

Any Creditor who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Balloting Agent at any time prior to the Voting Deadline.

A notice of withdrawal, to be valid, must (i) describe the Claim, as the case may be, if appropriate, represented by such Claim, (ii) be signed by the Creditor in the same manner as the Ballot was signed and (iii) be received by the Balloting Agent on or before the Voting Deadline. The Debtor reserves the absolute right to contest the validity of any such withdrawals of Ballots.

## CONFIRMATION OF PLAN

## CONFIRMATION HEARING

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan. **The Confirmation Hearing is scheduled to commence on _____, at 10:00 a.m. in the United States Bankruptcy Court, Alexander Hamilton Court House, One Bowling Green, New York, New York 10004.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

**Objections, if any, to confirmation of the Plan shall be filed and served on or before _____.** Objections must be served upon (i) Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Floor, New York, NY 10022, Attn.: Robert M. Sasloff, Esq., and (ii) United States Trustee, 33 Whitehall Street, 21st Fl., New York, New York 10004, and filed electronically in accordance with the Court's ECF procedures.

## REQUIREMENTS FOR CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. These requirements include determinations by the Bankruptcy Court that: (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the contents of the Plan comply with various technical requirements of the Bankruptcy Code, (iii) the Debtor has proposed the Plan in good faith, (iv) the Debtor has made disclosures concerning the Plan that are adequate and include information concerning all payments made or promised in connection with the Plan and the Case, (v) the Plan is in the "best interests" of all Creditors and Interest Holders, (vi) the Plan is feasible, and (vii) the Plan has been accepted by the requisite number and amount of Creditors or Interest Holders in each Class entitled to vote on the Plan, or that the Plan may be confirmed without such acceptances. The

Debtor believes that all of these conditions have been or will be met prior to the Confirmation Hearing.

**Best Interest Test.** The so-called "best interest" test requires that each impaired Creditor and impaired Interest Holder either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such entity would receive or retain if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.

To determine what the holders in each Impaired Class of Claims or Interests would receive if the Debtor were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in a chapter 7 liquidation case. The amount that would be available for satisfaction of Allowed Claims against and Allowed Interests in the Debtor would consist of the proceeds resulting from the disposition of the Debtor's assets, augmented by the cash held by the Debtor at the commencement of the chapter 7 case. Such amount would be reduced by the amount of any Claim or Claims secured by the Debtor's assets, the costs and expenses of the liquidation, and such additional Administrative Claims and Priority Claims that may result from the termination of the Debtor's business. Such value is then juxtaposed against the amount creditors are receiving under the Plan to determine if the value each impaired creditor is receiving is the same or more than such creditor would receive from a chapter 7 liquidation on the Confirmation Date.

The costs of liquidation under chapter 7 would become Administrative Claims with the highest priority against the proceeds of liquidation. Such costs would include the fees payable to a chapter 7 trustee, as well as those which might be payable to attorneys, financial advisors, appraisers, accountants and other professionals that such Debtor may engage to assist in the liquidation. In addition, chapter 7 costs would include any liabilities incurred or assumed pursuant to the transactions necessary to effectuate the liquidation. Moreover, claims entitled to administrative priority may arise by reason of any breach or rejection of any executory contracts entered into by the Debtor during the pendency of the Case in chapter 11.

After satisfying Administrative Claims arising in the course of the chapter 7 liquidation, the proceeds of the liquidation would then be payable to satisfy any unpaid expenses incurred during the time these Case was pending under chapter 11, including compensation for attorneys, financial advisors, appraisers, accountants and other professionals retained by the Debtor or any official committee appointed pursuant to section 1102 of the Bankruptcy Code. A liquidation analysis, annexed hereto as **Exhibit E** contains the Debtor's best estimate of the results of such a "hypothetical" liquidation on the Effective Date of the Plan.

After consideration of the effects that a chapter 7 liquidation would have on the proceeds available for distribution including (i) the increased costs and expenses of a chapter 7 liquidation arising from fees payable to the Debtor in bankruptcy and professional advisors to such Debtor, (ii) the erosion in value of the Debtor's assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, (iii) the potential increases in Claims which would be satisfied on a priority basis or on a parity with the Claims of General Unsecured Creditors, and (iv) the fact that the Plan calls for a substantial distribution to holders of Allowed Unsecured Claims, the Debtor believes that holders of Unsecured Claims would be unlikely to receive any significant distribution on account of their Claims and in all likelihood significantly less than the amount proposed in this plan.

**Liquidation Analysis.** In a liquidation scenario, while a distribution to unsecured creditors may be possible, the distribution would not be substantial. Accordingly, the Debtor believes that the Plan provides Creditors with at least as much as they would be entitled to receive in a chapter 7 liquidation.

**Feasibility.** For the Plan to be confirmed, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless such liquidation is set forth in the Plan. This Plan calls for plan payments to be made to the Creditors for the Net Sale Proceeds over a two (2) year span until paid in full. The proponent believes the Debtor's going forward operations and the sale of the Debtor's Property, will provide proceeds sufficient to satisfy all of the Debtor's Allowed Claims.

Projections with respect to the Debtor's operations are attached hereto as Exhibit A showing the anticipated operations of the Debtor over the next 2 years after the Effective Date. It is anticipated that the Debtor's operations will result in positive cash flow after the payment of ordinary operating expenses.

**Confirmation With the Acceptance of Each Impaired Class.** The Plan may be Confirmed if each impaired Class of Claims or Interests accepts the Plan. Classes of Claims or Interests which are not impaired are deemed to have accepted the Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the Claims or Interests of that Class are modified other than by curing defaults and reinstating maturities or by payment in full in cash.

Holders of Claims or Interests impaired by the Plan are entitled to file Ballots accepting or rejecting the Plan. Holders of Claims or Interests not impaired by the Plan, are

deemed to accept the Plan, and may not vote to accept or reject the Plan. Holders of Claims or Interests that will neither receive nor retain any property under the Plan and are deemed to reject the Plan.

The Bankruptcy Code defines acceptance of a plan by a Class of Claims as acceptance by the holders of two-thirds in dollar amount and a majority in number of Claims of that Class. Only those Claims, the holders of which actually vote to accept or reject the Plan, are counted for the purpose of determining whether the requisite number and amount of acceptances have been received.

**Confirmation Without the Acceptance of Each Impaired Class**. In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtor's request if (i) all other requirements of section 1129(a) of the Bankruptcy Code are satisfied, (ii) at least one impaired Class of Claims votes to accept the Plan without regard to any vote cast on account of a Claim held by "insiders" (as defined in the Bankruptcy Code) and (iii) as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Class. The Debtor believes that the Plan is in the best interest of all Creditors and Interest holders and strongly recommends that all parties entitled to vote cast their ballots in favor of accepting the Plan. Nevertheless, out of an excess of caution, pursuant to the Plan, the Debtor has requested that the Court confirm the Plan over the rejection of any non-accepting class in the event all other elements of section 1129(a) are satisfied.

A plan "does not discriminate unfairly" if the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are intertwined with those of the non-accepting class, and no class receives payments in excess of that which it is legally entitled to receive for its Claims or Interests. The Debtor believes that under the Plan all classes of Impaired Claims and Impaired Interests are treated in a manner that is consistent with the treatment of other classes of Claims and Interests with which their legal rights are intertwined, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and Allowed Interests in such class. Accordingly, the Debtor believes the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

Whether the Plan is fair and equitable depends upon the application of the so-called "absolute priority rule." Subject to certain exceptions, this rule, codified in section 1129(b)(2) of the Bankruptcy Code, generally requires that an impaired Class of Claims or

Interests that has not accepted the Plan must be paid in full if a more junior class receives any distribution under the Plan.

With respect to Secured Claims, the absolute priority rule allows the confirmation of a Plan over the rejection of a class of Secured Claims if the holders of such Claims retain their liens and each holder of a Claim of such class receives on account of such Claim deferred cash payments, totaling at least the allowed amount of such Claim, of a value, as of the Effective Date of the plan, of at least the value of such holder's interest in the property securing its Claim.

With respect to Unsecured Claims, the absolute priority rule allows the confirmation of a Plan over the rejection of a class of Unsecured Claims if the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property. There is however a "new value" exception to the absolute priority rule which the Debtor submits applies in this case.

In this case, Uptown Partners is retaining its equity interest in the Debtor in consideration for its guaranty of the payment to the Unsecured Creditors. The Debtor believes that the new value being contributed by Uptown Partners LLC is necessary and substantial. As Upton Partners LLC is retaining its equity interest post-confirmation on account of its going forward contribution to the Debtor's operations, and not on account of its prior equity position, the Debtor submits that the "new value" exception to the absolute priority rule applies.

With respect to Equity Interests, Section 1129(b)(2)(C) requires that the holder of such interest receive any fixed liquidation preference, fixed redemption price or the value of such interest or that no junior interest will receive or retain any property on account of such junior interest under the Plan. To the best of the Debtor's knowledge, interest holders are not entitled to any fixed liquidation preference or fixed redemption price. Moreover, the Debtor has determined that the value of such interest is zero. Finally, no junior interest receives or retains any property under the Plan on account of such interest. Accordingly, the Debtor believes the Plan complies with Section 1129(b)(2)(C) of the Bankruptcy Code.

If the Plan is rejected by either Classes 2 or 3, the Debtor requests that the Plan be confirmed under Section 1129(b).

**EFFECT OF CONFIRMATION**

**RELEASES**

Section 1125(e) of the Bankruptcy Code, commonly referred to as the "safe harbor," protects persons acting in good faith, from civil claims arising in connection with solicitations of acceptances of plans of reorganization or participating in the offer, issuance, sale or purchase of a security under the Plan. Pursuant to section 1125(e), as set forth in Article 8 of the Plan, neither the Debtor, nor its respective officers, directors, members, general partner, managers or employees (acting in such capacity), nor any professional person employed by any of them, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan except for (i) willful misconduct and gross negligence; (ii) liability of any released person for any debt owed to the United States Government, any state, city or municipality arising under (a) the Internal Revenue Code or any state, city or municipal tax code, (b) the environmental laws of the United States or any state, city or municipality; or (c) any criminal laws of the United States, or any state, city or municipality. From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any claim or liability released pursuant to Article 9 of the Plan.

The Plan also contains releases by and between the Debtor, on the one hand, and the Debtor's Creditors and Interest Holders, on the other, in consideration for the cash to be distributed to or on behalf of holders of claims and interests under the Plan. The exact terms of the releases are set forth in section 9.4 of the Plan, to which interested parties are referred. The releases set forth in section 9.4 of the Plan are deemed to have been given in exchange for the consideration set forth under the Plan. The language in article 9.4 of the Plan is intended to provide finality with respect to the Debtor's pre-petition conduct of its business affairs and to implement the protections of section 1125(e) of the Bankruptcy Code.

Any release contemplated herein shall not be deemed to amend or alter in any manner any releases executed in connection with the Messina Settlement Agreement or the Halpern Settlement Agreement which releases shall remain in full force and effect.

## INJUNCTION

**Except (i) as otherwise provided under Final Order entered by the Bankruptcy Court or (ii) with respect to the Debtor's obligations under the Plan, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin with respect to any Claim or Interest held as of the date of entry of the Confirmation Order (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from property of the Estate that has been, or is to be, distributed under the Plan, and (ii) the creation, perfection or enforcement of any lien or encumbrance against property of the Estate that has been, or is to be, distributed under the Plan.**

**Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act, to collect, recover or offset, from the Debtor, or from of the Estate, any claim, any obligation or debt that was held by any person or entity as of the Confirmation Date except pursuant to the terms of the Plan.**

## LIMITATION OF LIABILITY

**In addition to the releases set forth in section 9.4, the Plan contains certain limitations on liability with respect to actions taken in connection with the promulgation, confirmation and dissemination of the Plan. Such limitation is intended to require any person or entity which may desire to assert claims against the Debtor and certain other persons named in section 9.3 to assert such claims prior to confirmation of the Plan or be forever barred from raising such claims at a later date. This provision gives finality to parties involved in the Case with respect to any actions taken in connection with the Plan. Persons or entities who fail to raise such claims prior to confirmation of the Plan shall be deemed to have waived such claims and be forever barred from raising such claims as set forth in the Plan**.

## ALTERNATIVES TO THE PLAN

If the Plan is not confirmed by the Bankruptcy Court the alternatives may include (a) liquidation of the Debtor under chapter 7 of the Bankruptcy Code or (b) the promulgation and confirmation of an alternative plan of reorganization. If the Plan is not confirmed, the Debtor

could attempt to formulate a different plan of reorganization. Such a plan might involve both a reorganization and continuation of the Debtor's business or an orderly liquidation of its assets

The Plan proposes payment of a substantial distribution to holders of claims in classes 2 and 3 and therefore the Plan provides a recovery to all Creditors and Interest Holders equal to or greater than would be obtainable in a chapter 7 liquidation. See Liquidation Analysis.


## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The Debtor has not researched the tax consequences of the Plan to holders of Claims and Interests. The Debtor has not requested any ruling from the Internal Revenue Service or any other taxing authority with respect to such matters. Therefore, the Debtor offers no statements or opinions that are to be relied upon by the creditors as to the treatment of creditors' claims under the Plan. Matters not discussed in this Disclosure Statement may affect the tax consequences of the Plan on any particular holder of a Claim or Equity Interest. Holders of equity interests that choose not to participate in the Plan may have adverse tax consequences resulting from such decision. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS.


## ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, and the other materials delivered together herewith and all deliveries, correspondence and questions, as the case may be, relating to the Plan should be directed to (i) the Debtor's counsel, Robinson Brog Leinwand Greene Genovese & Gluck P.C., 875 Third Avenue, 9th Fl., New York, NY 10022, Attn.: Robert M. Sasloff, Esq., (212) 603-6300 or (ii) may be retrieved from the Court's web site at https://ecf.nysb.uscourts.gov (provided such party has PACER access) by searching case no 10-11391(ALG).

Copies of all pleadings, orders, lists, schedules, proofs of claims or other documents submitted in this case are on file in the Office of the Clerk of the United States Bankruptcy Court at Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, and are available for public inspection Monday through Friday, between the hours of 9:00 a.m. and 5:00 p.m.

## CONCLUSION

The Debtor believes that the Plan is in the best interests of all Creditors and Interest Holders.

**Dated:** New York, New York
November 24, 2010

**THE LENOX CONDOMINIUM LLC**

By:/S/Lewis Futterman_____
      Name:  Lewis Futterman
      Title:    President

**ROBINSON BROG LEINWAND
GREENE GENOVESE & GLUCK P.C.
Counsel to the Debtor**
875 Third Avenue, 9th Floor
New York, New York 10022

By: /S/Robert M. Sasloff_____
      **Robert M. Sasloff**